## Renaissance Bistro v.
## Pennsylvania Liquor Control Board

*George A. Gonzalez,* for plaintiff.
*John K. Stark,* for defendant.

SPRECHER, *J.,* January 15, 2010—Germaine M. Marcano t/a Renaissance Bistro appeals from the order of this court dated October 16, 2009, which sustained the decision of the Pennsylvania Liquor Control Board denying Bistro's liquor license renewal application and its attendant amusement permit under the Liquor Code. This opinion is filed pursuant to Pa.R.A.P. 1925.

### FACTS

Bistro filed an application for the renewal of its license for the period beginning April 1, 2007, and ending March

31, 2009. The board's Bureau of Licensing notified Bistro that it had objections to the renewal application and a hearing would be held on the objections. The hearing examiner recommended renewal of the license, but the board was not convinced that Bistro's license should be renewed based on its dismal operations. Therefore, the board denied Bistro its liquor license renewal application and its attendant amusement permit.

Bistro appealed the board's decision to this court. Board issued a detailed opinion regarding its reasons for refusing the renewal of the liquor license. The facts gleaned from the record before the board are as follows.

On October 27, 2006, Bistro entered into a conditional licensing agreement (CLA) with board to resolve problems concerning an extension of its premises. The CLA permitted the extension provided that Bistro agreed to:

"(1) become complaint with the Responsive Alcohol Management provisions (R.A.M.P.) of the Liquor Code within 90 days of the agreement;

"(2) maintain at least monthly contact with police;

"(3) remove all blind walls in the premises;

"(4) soundproof the premises;

"(5) keep doors closed;

"(6) patrol exterior of premises at least hourly;

"(7) install 12 surveillance cameras to monitor the interior and exterior of the premises;

"(8) monitor the cameras;

"(9) install a transaction scan device and a metal detector;

"(10) maintain and enforce a written barred patron list;

"(11) employ at least one, and after remodeling, two doormen/security guards on weekends from 8 p.m. to closing;

"(12) promptly address neighbor/police concerns about illegal parking;

"(13) refrain from obtaining more adjudicated citations."

Bistro has a long history of receiving citations. On December 25, 2005, it received notice of a violation from the Reading Police Department for music coming from the establishment after hours.

A citation was issued on January 24, 2006, for operating the bar in a noisy and/or disorderly manner on October 19, 20, 24, 25, 28, 29, November 1, 2, 6, December 5, 6, 7, 8, 10, 12, 19, 21, and 22 in 2005. A neighbor 120 feet away heard loud music emanating from the bar. Bistro admitted the charge and paid a fine of $750.

A citation was issued on April 10, 2006, for an incident on February 19, 2006, because Bistro permitted the use of a loudspeaker whereby sound could be heard outside. Additionally it sold alcohol to three minors on February 18 and February 19, 2006. Bistro admitted the charge and paid a fine of $1,550.

A citation was issued on October 26, 2006, because Bistro served alcoholic beverages on September 3, 2006,

a Sunday, after 2 a.m. Bistro admitted the charge and paid a fine of $1,000.

On October 30, 2006, Bistro received a non-traffic citation from the Reading Police Department for allowing music to be heard at a distance of more than 50 feet from the establishment.

In addition to receiving the citations, Bistro has been involved with criminal activity occurring on or near the premises. On October 27, 2005, the Reading Police Vice Division and the Pennsylvania State Police, Liquor Control Enforcement Unit discovered seven small baggies of marijuana in a patron's coat. The patron was arrested and charged with possession of marijuana. On December 4, 2005, a shooting victim with a gunshot wound in his back was found lying in Bistro's parking lot behind the building. The victim was taken to the hospital, and the assailant was later arrested and convicted. The assailant was a patron who was evicted earlier from the premises.

According to its opinion, the board refused the renewal application because Bistro's history clearly demonstrated irresponsibility, apathy, and an abuse of license privileges. It based its decision on Bistro's three adjudicated citations, four incidents, including a shooting, in the two-year renewal period, and Bistro's failure to comply with the CLA into which it voluntarily entered.

This court took additional testimony at the hearing before it. Mark Talbot, the deputy chief of the Reading Police Department, deals specifically with nuisance bars. He testified he had recommended that one of two entrances not be used to cut down on noise emanating from

the bar. Bistro did not follow this recommendation consistently. In June 2009 he observed speakers facing the door that is usually used for patrons. He asked Ms. Marcano to turn the speakers and to stop using that entrance. Instead of ceasing the use of that entrance, Bistro installed its metal detector there sometime after the discussion. Therefore, Chief Talbot believes that the problem of noise will just be perpetrated in the future.

On three separate occasions Chief Talbot went to the Bistro. On each visit the surveillance cameras were not operational. As recent as three months prior to the hearing before this court the cameras were not working. The bar was unable to provide a tape that Chief Talbot wanted to review for suspicious activity that he had observed during his visit in June 2009.

Noise violations were filed against Ms. Marcano's son, Chris Marcano, on September 8, 2008, and September 15, 2009, for incidents. Ms. Marcano had a noise evaluation done. Her expert recommended that the doors should be kept closed except when patrons are entering or leaving and that only one of two doors at an entrance should be used. The expert also advised that the sound system should not be operated above 50 percent of its power. He further suggested that the addition of a covered entrance or a vestibule would help to decrease the noise emanating from the bar. Ms. Marcano does not have sufficient funds at this time to install a covered entrance.

Ms. Marcano spent $250,000 to extend the premises. Most of the renovations were completed by September

2007. She installed a metal detector at a cost of $3,000 and 16 surveillance cameras.

Ms. Marcano testified that she had made monthly attempts to contact the Reading Police Department. However, Chief Talbot testified that she had contacted him just three times during the relevant period.

The bartenders completed the R.A.M.P. training on November 5, 2007. The bartenders make up the barred patrons list. The list contains the following 10 names:

(1) Junbug (Corniell Jr.)

(2) Walt

(3) Pig

(4) Leroy

(5) Brain (Jamaican)

(6) Macho

(7) Kevin (old Security)

(8) Glenn

(9) Gloria

(10) Chancy Martin

The bartenders are supposed to call the police if any of the above people come into the bar. Ms. Marcano tells the bartenders to set the volume on the sound system between 47 and 50 percent of total output.

Bistro employs one security guard even on weekends unless there is a special function occurring on the premises. If there is a special event happening, then an additional security guard is employed.

Ms. Marcano does not have a board approved manager. She is the only person on record that is either a manager or owner. She is at the bar usually in the mornings when it opens at 11 a.m., but not in the evenings. Her oldest son, Dave, Dave's wife, and her grandson help out in the evenings after they finish at work. Her son, Chris Marcano, "is around to help out but he does not like to get involved too much with the riffraff and stuff like that." Transcript at 90.

Based on the foregoing record, this court entered the order which Bistro now appeals. Bistro timely filed a concise statement of errors complained of on appeal.

## ISSUES

Bistro raises the following issues in its concise statement.

(1) Does the record introduced before this court regarding the citation history of Bistro demonstrate such a degree of egregious activity or abuse of the licensing privilege to warrant non-renewal?

(2) Does the record of certain non-adherence of a CLA as entered into by the parties on October 27, 2006, from its inception to the date of the hearing as held by this court, by itself warrant a finding by this court that failure to adhere to these conditions as set forth in the CLA warrant non-renewal of the license?

(3) Does the record introduced before this court regarding both the citation history of Bistro and of the non-adherence to a CLA as entered into by the parties on October 27, 2006, from its inception to the date of the

hearing as held by this court, warrant a finding of non-renewal of the liquor license in that these violations evidence egregious activity or abuse of the licensing privilege and/or established that Bistro failed to take affirmative, substantial measures to address and prevent the recurrence of these unlawful activities on or about the licensed premises?

## DISCUSSION

This court shall address Bistro's issues collectively. A common pleas court, hearing an appeal under the section of the liquor code involving the renewal or transfer of liquor licenses or amusement permits, is prohibited from reversing a decision of the Liquor Control Board unless there has been a manifest abuse of discretion or the court makes findings of fact that vary from those made by the board. The court is not permitted to substitute its findings of fact for those of the board when the evidence before the two tribunals is substantially the same. *Pennsylvania Liquor Control Board v. Can Inc.,* 664 A.2d 695 (Pa. Commw. 1995). This court did not find that the board committed a manifest abuse of discretion, and it did not find that the facts differed from those findings made by the board. Instead, it found that the additional testimony was merely cumulative.

Bistro did not comply with many terms of the CLA. It was supposed to become compliant with the R.A.M.P. provisions by January 30, 2007. It only became compliant on November 5, 2007, more than 10 months late.

Instead of maintaining *at least* monthly contact with the police, Ms. Marcano met only four times with Chief

Talbot since October 27, 2006. Although surveillance cameras were installed, they were not functional for much of the relevant period. Thus, they could not be monitored or their tapes reviewed.

The written barred patron list is a joke. It is comprised of nicknames and first names only. Out of 10 names only one name may be a complete name.

Bistro agreed to install a metal detector. It was not installed until late in 2009. Furthermore, it was installed at an entrance that was strongly recommended by the police department and others to remain closed to reduce noise.

After the renovations were completed, Bistro was to employ two doormen/security guards on weekends. Bistro, however, still only employs one security guard unless there is a special function on the premises.

Bistro was to refrain from having additional adjudicated citations. It did not do so. Additional citations were filed in 2007, 2008, and 2009.

Therefore, out of 13 conditions placed on Bistro by the board, Bistro did not completely fulfill its obligations for 10 of them. As the board stated in its opinion, Bistro has a dismal history. Moreover, there is no indication that the violations will be rectified in the near future, if ever. Bistro knew that it was under close scrutiny by the board. Even realizing this, it did little to satisfy its duties under the CLA. Hence, there is nothing to suggest in the case sub judice that Bistro will ever be fully compliant and responsible to hold a liquor license. The board did not abuse its discretion in not renewing Bistro's application. This court had no basis to overturn its decision.

In accordance with the foregoing opinion, this court submits that its order should be affirmed and the appeal denied.